## McAvoy, Admin'x, v. Philadelphia & Reading Railway Co.

*Railroads—Negligence—Master and servant—Risk of employment—Federal Employers' Liability Act.*

1. In an action under the Federal Employers' Liability Act of March 2, 1893, ch. 196, to recover damages for the death of a trainman killed while employed in coupling cars engaged in interstate commerce, a non-suit is properly entered where it appears that the injury which caused his death was incidental to his employment and that every element of such risk must have been known to him by reason of his experience.

2. Except in case of injury resulting from the violation of Federal statutes intended to safeguard employees engaged in interstate commerce, the doctrine of the assumption of risk is a complete defence.

3. The employee assumes as a risk of his employment such dangers as are normally and necessarily incident to his employment, and a workman of mature years is taken to assume them whether he is aware of their existence or not.

4. It is only in a clear case that the question of the assumption of a risk is one of law for the court, and where there is doubt as to the facts, or as to inferences to be drawn from them, it becomes a question for the jury. The burden of proof as to the assumption of risk is on the defendant.

5. It seems that a railroad company is not obliged to station a trainman as an outpost to warn another member of his crew, who is about to couple, or is in the act of coupling, air-hose underneath a car, of the imminence of the approach of other cars intended to make up the train or belonging to it.

Rule to take off non-suit. C. P. Schuylkill Co., July T., 1922, No. 108.

*A. D. Knittle*, for plaintiff; *John F. Whalen* and *Geo. Ellis*, for defendant.

BERGER, J., Jan. 7, 1924.—This is an action under the Federal Employers' Liability Act, brought by the plaintiff to recover damages for the death of her husband, Michael J. McAvoy, caused by an injury which he received while in the employ of the defendant as a trainman, and engaged in making up a train for movement in interstate commerce. About 1.45 A. M., Oct. 19, 1921, the crew of the freight train to which McAvoy belonged was directed to make up a train in the yard at Abrams, on track No. 5, on which they placed a car with a caboose attached at the rear, to which the rest of the cars then on that track, six or eight in number, were to be attached, and to which other cars which were to be shifted on to that track were also to be attached, to complete the train. The engine and all of the crew, except McAvoy, who remained with the caboose and car on track No. 5, proceeded to track No. 8, and remained there for orders. The other cars to make up the train were to

be shifted on to track No. 5 by the yard crew, of which James H. Henning was the engineer and Harry Huntzinger the flagman, but one shifting crew being on duty at the same time in that yard. Either before or after the cars previously placed on track No. 5 had been brought in contact with, or attached to, the car and the caboose placed there by McAvoy's crew, the yard crew was shifting southward through the yard a draft of twenty-five or twenty-six cars for attachment to the cars already in place on that track. The engineer was moving or pushing the cars in accordance with the signals given to him by his flagman, with the purpose of bumping the cars at rest on No. 5 track with sufficient force to cause the automatic couplers of both sections of the train to interlock. He got a signal from his flagman to stop at the moment the two sections were about to come into contact, which he obeyed, with the result, however, as was the intention of his crew, that the contact was actually completed with force sufficient to couple the two sections before stopping. Although it is not quite clear, the evidence seems to warrant the statement that on a signal from his flagman the engineer then started to move his engine again for the purpose of pushing the combined sections of the partly made up train southward, and as soon as he had started, stopped again upon a signal from his flagman. At the first impact of the two sections, or soon thereafter, McAvoy evidently was under a car of the first-placed section of eight cars, in the act of coupling the air-hose under the cars, and by the movement of the cars under which he was at work was so seriously injured that he died within several hours after the injury. When he was injured, his outcry first brought to him Charles H. Deibler, the conductor of their crew, to whom he immediately said: "Get me out of here. That's what you get for connecting the air-hose when you don't know what is going on." Under the rules of his employer, it was McAvoy's duty to assist in making up the train and to couple the air-hose, but the time when the air-hose was to be coupled by him was at his own election, until he was ordered to do it by the conductor of his train, but who had not given him any order to couple the air-hose. By the rules of the defendant company, no signal to him was required to be given by the yard crew of the approach of the cars being pushed or shifted by it, and none was given, nor was any person required to be stationed as an outpost to give trainmen in the act of making up their trains notice of the approach of the cars about to be pushed or shifted into and against their uncompleted train. The classification of the yard at Abrams was not established, but it was proved that no air-hose inspectors were employed in that yard.

The negligence charged against the defendant is (1) the employment of the yard crew to shift cars, whose air-hose it became McAvoy's duty to couple, on to track No. 5 in the course of making up the train for his crew, and "to run, bump, push and collide" the cars which they were shifting against those which had previously been placed on track No. 5 and lay at rest there, so as to cause the cars which were at rest to move and run over McAvoy; (2) the failure to make and enforce rules intended to give notice to McAvoy, the trainman, of the approach of cars intended to be bumped or pushed against the cars in his uncompleted train while it lay at rest; and (3) failure on the part of the defendant to employ air inspectors to couple the air-hose instead of requiring train brakemen to do it. Upon the close of plaintiff's case-in-chief, an involuntary non-suit was entered, on the ground that there was no evidence tending to establish the negligence of the defendant, the question now being whether the non-suit shall be taken off. In the consideration of that question, it is our duty to view the evidence in the light most favorable

to the plaintiff, and to take off the non-suit if there is any evidence beyond a mere scintilla to establish the defendant's negligence or to support the plaintiff's cause of action: Bastian *v*. Philadelphia, 180 Pa. 227.

The third ground of negligence alleged has been abandoned, and the other two are so closely related that they may well be considered together. McAvoy was an experienced railroader, having been employed by the defendant for twenty-two years, and he had been a freight brakeman on the same train for a period of about four months immediately preceding his death. The train on track No. 5, according to the uncontradicted evidence, was being made up by the shifting crew, assisted by McAvoy. The draft of twenty-five or twenty-six cars which was pushed or bumped against the cars previously placed on track No. 5, and at rest there, was brought a distance of at least a quarter of a mile from the northern part of the yard before coming in contact with those cars. Some time, therefore, must have elapsed before the two sections were brought together to be coupled, thus affording McAvoy ample opportunity to ascertain whether any cars were approaching before he went under any of the cars which lay at rest for the purpose of coupling the air-hose. He knew the cars were required to be coupled by impact, under the provisions of the Act of Congress of March 2, 1893, ch. 196, § 2, 27 Stat. at L. 531, as is stated in Allen *v*. Tuscarora Valley R. R. Co., 229 Pa. 97; and his experience was surely sufficient to cause him to know that impacts made for the purpose of coupling would cause the car or cars under which he was working to move to his probable injury. The shifting crew was not working independently of him, but jointly with him, in making up the freight train. The injury which caused his death, therefore, was incidental to his own employment, and every element of risk entering into his own employment must have been known to him by reason of his experience. The risk of being injured by having cars shifted against those underneath which he had to go to couple the air-hose was, under the present state of facts, an open and obvious one. Except in cases of injury resulting from the violation of Federal statutes intended to safeguard employees engaged in interstate commerce, the doctrine of the assumption of risk is a complete defence. In Dutrey, Admin'x, *v*. Phila. & Reading Ry. Co., 265 Pa. 215, 220, the doctrine is thus stated: "The employee assumes, as a risk of his employment, such dangers as are normally and necessarily incident to his occupation, and a workman of mature years is taken to assume them whether he is aware of their existence or not; but risks of another sort, not naturally incident to the occupation, may arise out of the failure of the employer to exercise due care. They are the unusual, extraordinary and unexpected acts, and the employee is not to be treated as assuming such risks until he becomes aware of their existence, unless the act or risk is so obvious that an ordinary prudent person would have observed and appreciated them: Seaboard Air Line *v*. Horton, 233 U. S. 492; Jacobs *v*. Southern Ry. Co., 241 U. S. 229; Boldt *v*. Pennsylvania R. R. Co., 245 U. S. 441; C. & O. Ry. Co. *v*. De Atley, 241 U. S. 310, 315; Erie R. R. Co. *v*. Purucker, 244 U. S. 320; C. & O. Ry. Co. *v*. Proffitt, 241 U. S. 462, 468. It is only in a clear case that the question of the assumption of a risk is one of law for the court, and where there is doubt as to the facts, or as to inference to be drawn from them, it becomes a question for the jury: Falyk *v*. Pennsylvania R. R. Co., 256 Pa. 397, and cases there cited. The burden of proof as to the assumption of risk is on the defendant: Kanawha & Michigan Ry. Co. *v*. Kerse, 239 U. S. 576, 581." See, also, Schlemmer *v*. Buffalo R. & P. R. R. Co., 220 U. S. 590, 55 Law Ed., 596; Chicago, R. I. & P. R. R. Co. *v*. Ward, 252 U. S. 18, 64 Law Ed., 430.

McAvoy, Admin'x, *v.* Philadelphia & Reading Railway Co.

Although the burden of proof is on the defendant when he defends on the ground of assumption of risk, in clear cases the question whether the employee assumed the risk which caused his injury is one of law for the court: Mumma *v.* Phila. & Reading Ry. Co., 275 Pa. 277, 283-284. This case, in our opinion, is of that class. Nor do we believe that a railroad company is obliged to station a trainman as an outpost to warn another member of his crew who is about to couple, or is in the act of coupling, air-hose underneath a car of the imminence of the approach of other cars intended to make up the train or belonging to it. We, therefore, refuse to take off the non-suit.

Rule to take off compulsory non-suit is discharged.

From J. O. Ulrich, Tamaqua, Pa.